Electronically Filed
Intermediate Court of Appeals
CAAP-12-0000139
30-JAN-2015
02:08 PM

CAAP-12-0000139

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

STATE OF HAWAI'I, Plaintiff-Appellee,
v.
AARON SUSA, Defendant-Appellant.

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NOS. 05-1-0144 & 09-1-1605)

MEMORANDUM OPINION
(By: Nakamura, C.J., and Fujise and Ginoza, JJ.)

Plaintiff-Appellee State of Hawai'i (State) charged
Defendant Appellant Aaron Susa (Susa) with second-degree murder,
alleging that he intentionally or knowingly caused the death of
Bryanna Antone (Antone).  After a jury trial, Susa was found
guilty as charged.  The Circuit Court of the First Circuit
(Circuit Court)[1] sentenced Susa to life imprisonment with the
possibility of parole and a mandatory minimum term of ten years
as a repeat offender.

---

[1] The Honorable Dexter D. Del Rosario presided over the proceedings
relevant to this appeal.

On appeal, Susa contends: (1) the Circuit Court erred in denying his motion to dismiss the case for lack of prosecution; (2) the Circuit Court erred in denying his motion for withdrawal of appointed counsel; (3) the Circuit Court erred in failing to preclude all evidence that he attempted suicide, had just been released from prison, and did not want to return; (4) the Circuit Court erred in excluding the Deputy Medical Examiner's statement, set forth in her autopsy report, that Antone's manner of death was classified as "undetermined"; (5) his conviction should be vacated for prosecutorial misconduct; (6) the Circuit Court erred in responding to a communication from the jury and in failing to declare a mistrial; and (7) his trial counsel provided ineffective assistance. As explained below, we affirm.

BACKGROUND

I.

Antone was visiting Hawai'i with her mother and brother. In the evening on October 1, 2009, Antone and her brother met Susa and Drake Garcia (Garcia) while walking in Waikīkī. The four of them drank alcohol and smoked marijuana. At some point, Susa and Antone split off from the others. At about 1:00 or 2:00 in the morning, Antone's brother was able to contact Antone by phone. He told Antone to get back to their room, but Antone said she was "going to south shore or the ocean side[.]"

In the early morning on October 2, 2009, Norimitsu Wada-Goode (Wada-Goode), a fry cook at the Royal Hawaiian Hotel, saw a couple on the beach in front of the hotel. About ten to fifteen minutes later, Wada-Goode saw a couple in the ocean. At about 3:30 a.m., Sarah Rodby (Rodby) saw someone in the water with an irregular-shaped object. A short time later, Rodby and her husband saw Susa near the hotel. Susa was wet, breathing heavily, had on shorts with no shirt, and kept his head down as he walked quickly past them. At about 5:50 a.m., Jill Overstreet saw Antone's nude body rolling in the surf. Attempts to revive

2

Antone failed. In the vicinity of Antone's body, the police recovered Antone's slippers and a manila envelope. Inside the envelope was "a federal detention paper" with Susa's name on it.

Three days after Antone's body was found, Susa attempted suicide by drinking and injecting Drano. Susa was taken to the hospital, where he was interviewed by Honolulu Police Department (HPD) detectives. In his recorded interview, Susa stated that on the day he met Antone, he had just been released from jail. Susa stated that he attempted suicide because he knew the police wanted to get him. Although he denied doing anything wrong, Susa stated that the police were going to get him and "take [him] to jail." Susa also explained why he had been hiding from the police. Susa stated that "I just got out, man. I'm trying to -- I'm -- I'm trying to have some freedom."

DNA analysis revealed an extremely high probability that Susa's DNA was present in swabs taken from Antone's interior vaginal area and in fingernail clippings taken from Antone's right and left hands. Dr. Gayle Suzuki (Dr. Suzuki), the Deputy Medical Examiner who performed Antone's autopsy, testified that Antone's cause of death was drowning, but that she could not say how Antone drowned. Dr. Suzuki also testified that Antone had "strangulation-type injuries" and "blunt force type" injuries to her neck and jaw area and ruptures of blood vessels in her eyes. The injuries to Antone's neck and throat, including fractures to cartilage in her neck area, resulted from "direct applied pressure to the neck." Dr. Suzuki indicated that the observation of foam and froth in Antone's mouth was consistent with her being alive while in the water.

John Collen (Collen), Susa's friend and former cellmate, testified pursuant to a cooperation/plea agreement with the State. Collen testified that in the early morning on October 2, 2009, he was on the beach in Waikīkī, looking for things to steal. He saw men's slippers, a white t-shirt, a manila envelope, and a purse. He took the men's slippers and the t-shirt, but left the other things. At about 4:30 a.m., he saw

Susa run by.  Later that day, Collen came into contact with Susa, who said he needed to get out of Waikīkī.  Collen permitted Susa to stay with him for several days.

According to Collen, Susa stated that he met Antone and had sex with her in the ocean; that when they got out of the water, Antone's belongings were missing, and she thought Susa "had something to do with her stuff being missing"; that Antone argued with Susa, scratched him, and dug her nails into his chest; that in response, Susa choked her and she stopped breathing, but he was not sure that she was dead; and that Susa pulled her into the ocean and drowned her.  A friend told Collen that Susa looked exactly like the man being shown on the news and in the newspaper, and Collen related this information to Susa. Susa asked Collen whether "if [Collen] was in [Susa's] situation, . . . would [Collen] kill [himself]."  Collen responded that if he were in Susa's situation, he would kill himself because "it's better than doing life in prison."  Susa then asked Collen for a needle so "he could shoot up Drano to kill himself."  Collen gave Susa a needle after Susa said there was nothing Collen could do to change Susa's mind.  Several months later, Collen saw Susa while they were both in prison, and they shared the same cell for several weeks.

## II.

Susa testified in his own defense.  Susa testified that on October 1, 2009, he was released from jail and went to Waikīkī.  That evening, he met Antone and her brother, and Susa later went with Antone to the beach.  According to Susa, at some point they went into the water, where they had consensual sex, during which Antone scratched his shoulders.  When they emerged from the water, Antone's purse was missing.  This angered Antone, and she accused Susa of "set[ting] her up."  Antone argued with Susa and grabbed his bare chest and his hip.  Susa testified that he pushed Antone, told her she was crazy, and walked away.  Susa denied killing Antone and denied ever choking Antone, holding her under the water, or trying to kill her.

Susa testified that he tried to commit suicide while he was staying with Collen because "[i]t would have been the third time that I would have went back to jail with nothing, I didn't even accomplish anything." Susa stated that the police looking for him was "one factor" in his trying to commit suicide, but that he was also paranoid from the methamphetamine Collen had given him. Susa also stated that he had attempted to commit suicide before as the result of being depressed or feeling hopeless.

The jury found Susa guilty as charged. The Circuit Court entered its Judgment on February 15, 2012, and this appeal followed.

DISCUSSION

We resolve Susa's contentions on appeal as follows.

I.

Susa argues that the Circuit Court erred in denying his motion to dismiss the case for lack of prosecution. We disagree.

Susa's motion to dismiss stemmed from the State's difficulty in securing the presence of Dr. Suzuki for trial. Dr. Suzuki was the Deputy Medical Examiner who performed Antone's autopsy, but she had subsequently left her employment with the Honolulu Medical Examiner's Office and relocated to Virginia.

On November 3, 2010, the State moved for a trial continuance because Dr. Suzuki could not return to Hawai'i for the scheduled November 29, 2010, trial date. Susa did not object to this motion, which the Circuit Court granted on February 14, 2011. On February 22, 2011, the State gave notice that it intended to call Kanthi De Alwis (Dr. De Alwis) as a substitute expert witness to testify on Antone's cause of death. Susa objected and the Circuit Court denied the State's request to permit Dr. De Alwis to testify as a substitute expert, with the understanding that the State would advise Dr. Suzuki that the Circuit Court may compel her attendance. The State subsequently informed the Circuit Court that Dr. Suzuki indicated that she was willing to return to Hawai'i to testify.

5

On August 16, 2011, the State moved to continue the August 22, 2011, trial date because Dr. Suzuki had informed the State on August 15, 2011, that she would not be able to return to Hawai'i to testify at the scheduled trial. The State had previously served Dr. Suzuki on August 4, 2011, with a subpoena to appear and testify at the trial. Dr. Suzuki, however, explained that she could not return to Hawai'i because she had been subpoenaed for a Virginia murder trial.

In response to the State's motion for a continuance, Susa moved to dismiss the case for lack of prosecution. The Circuit Court denied Susa's motion. In support of its ruling, the Circuit Court noted that except for Dr. Suzuki, the State had secured all other witnesses, including mainland witnesses; that the absence of Dr. Suzuki was not brought about by the lack of due diligence by the State, as Dr. Suzuki had made representations to the State that she would appear; that the State had served Dr. Suzuki with a subpoena to appear for trial; and that prior to Dr. Suzuki's notifying the State that she would not appear, the State lacked reasonable cause to seek a material witness warrant. Balancing the State's interest in prosecuting a very serious murder charge with Susa's right to a speedy trial, the Circuit Court denied Susa's motion to dismiss the case. The Circuit Court authorized the State to secure Dr. Suzuki's attendance through a material witness warrant, and it continued the trial to October 17, 2011, a period of time "minimally adequate to obtain the attendance of [Dr. Suzuki]."

In determining whether to exercise its inherent authority to dismiss a case for lack of prosecution, the court must "balanc[e] . . . the interest of the state against fundamental fairness to a defendant with the added ingredient of the orderly functioning of the court system." State v. Mageo, 78 Hawai'i 33, 37, 889 P.2d 1092, 1096 (App. 1995) (internal quotation marks and citations omitted). Here, the failure of Dr. Suzuki to appear for the trial scheduled for August 22, 2011, was not due to the lack of diligence by the State; this case involved

6

a serious offense -- murder in the second degree; and Dr. Suzuki, as the medical examiner who performed the autopsy on Antone, was an essential witness. Although Susa argues that he was in custody for almost two years awaiting trial, he was also in custody for independent violations of the conditions of his probation in a separate case. We conclude that the Circuit Court did not abuse its discretion in denying Susa's motion to dismiss for lack of prosecution.

II.

We reject Susa's claim that the Circuit Court erred in denying his motion for withdrawal of appointed counsel.

After the first day of jury selection, Susa made an oral motion "to dismiss [his] counsel" due to "inadequate services," complaining that he had received discovery late, that counsel missed visits with him, and that counsel had suddenly advised him to accept a plea bargain. Defense counsel denied that she had recommended that Susa "plead out to a deal." Defense counsel represented that she had vast experience with the public defender's office, had handled over a hundred jury trials, and was providing Susa with "more than adequate representation[.]" The Circuit Court denied Susa's oral motion.

"There is no absolute right, constitutional or otherwise, for an indigent to have the court order a change in court-appointed counsel." State v. Kossman, 101 Hawai‘i 112, 119, 63 P.3d 420, 427 (App. 2003) (internal quotation marks, citation, and brackets omitted). We will not overturn a trial court's decision to deny a change in appointed counsel "unless there was an abuse of discretion that prejudiced the defendant by amounting to an unconstitutional denial of the right to *effective* assistance of counsel." Id. (internal quotation marks and citation omitted).

It appears from the record that Susa's appointed counsel was prepared for trial, zealously represented Susa, and provided him with effective representation. Susa did not demonstrate an irreconcilable conflict with his counsel, good

7

cause warranting the appointment of substitute counsel, or the denial of his right to effective assistance of counsel. See id. at 119-21, 63 P.3d at 427-29. Accordingly, Susa has not shown that the Circuit Court abused its discretion in denying his motion for withdrawal of his appointed counsel.

III.

Susa argues that the Circuit Court erred in failing to preclude all evidence that he attempted suicide, had just been released from prison, and did not want to return. We disagree.

After the State filed notice of its intent to introduce evidence of Susa's prior criminal record, Susa moved in limine to exclude evidence that Susa had "attempted to commit suicide" and "had just been released from prison." The State filed an opposition to Susa's motion in limine, arguing that evidence that Susa had just been released from jail and had attempted suicide was relevant to his motive for killing Antone (he did not want to go back to jail after Antone accused him of complicity in the theft of her belongings) and his consciousness of guilt (he was concerned about going back to jail because he knew he had killed Antone). The Circuit Court permitted the State to introduce evidence that Susa had attempted suicide and had been released from jail the day before Antone's body was found, but excluded evidence of the specific nature of and details concerning Susa's prior criminal record.

We conclude that the Circuit Court did not abuse its discretion in permitting the State to introduce the evidence challenged by Susa. The evidence that Susa had just been released from jail and did not want to return was relevant to place his attempted suicide in context. It showed that Susa's attempted suicide was related to his desire not to return to jail, and was not based on something unrelated to Antone's death. Indeed, during his statement to HPD detectives, Susa explained that he attempted suicide because he knew the police wanted to get him and would take him to jail. He also told the detectives that he had just got out of prison and valued his freedom. Thus,

8

Susa's own statements demonstrated a direct link between his attempted suicide and his recent release from jail and desire not to return.

The evidence that Susa had attempted suicide, combined with the evidence that he had just been released from jail the day before Atone's death and did not want to return to jail, provided strong evidence of his consciousness of guilt. It served to show that Susa knew that he had murdered Antone and that to avoid returning to jail, he took the drastic step of attempting suicide. At trial, the Circuit Court gave the jury a limiting instruction to ensure that the evidence regarding Susa's recent release from jail would only be considered for proper purposes.[2] The jury is presumed to follow a trial court's instruction, and the Circuit Court's limiting instruction served to mitigate any unfair prejudice resulting from the challenged evidence. State v. Kazanas, 134 Hawai'i 117, 129, 336 P.3d 217, 229 (App. 2014). We conclude that the Circuit Court did not abuse its discretion in permitting the State to introduce the evidence challenged by Susa. See Hawaii Rules of Evidence (HRE) Rule 404(b) (Supp. 2014); State v. Clark, 83 Hawai'i 289, 300-03, 926 P.2d 194, 205-08 (1996).

---

[2] The Circuit Court gave the following limiting instruction:

[Y]ou have heard evidence that the defendant had been in jail or in prison or in custody at some point in time. This evidence is offered for the limited purpose of showing the circumstances surrounding the defendant attempting to commit suicide, and you are to consider this evidence solely for this limited purpose. In other words, you're not to consider this evidence for the purpose of determining that the defendant, because he was in prison, is of bad character or a bad person; that is improper. Okay?

Also, for example, you are not to consider this evidence that he was in jail before for the purpose of, because he was in jail before, therefore he must have committed this crime; that is improper. Okay?

When the Court gives you instructions regarding the limited consideration of evidence, you are to consider that evidence only for its limited purpose.

IV.

Susa contends that the Circuit Court erred in excluding Dr. Suzuki's statement, set forth in her autopsy report, that Antone's manner of death was classified as "undetermined." We disagree.

The Circuit Court granted the State's motion in limine to exclude evidence of Dr. Suzuki's classification of Antone's manner of death as "undetermined." In support of its motion, the State explained that the Department of the Medical Examiner uses two general categories, natural death and violent death, when arriving at conclusions regarding a decedent's manner of death. The category of violent death is further divided into four subcategories -- homicide, suicide, accident, and undetermined. Dr. Suzuki wrote in her autopsy report that "[e]ven though the cause of death is drowning, because of the suspicious circumstances surrounding the death as well as the injuries found at autopsy, a homicide cannot be excluded. Therefore, the manner of death is classified as undetermined."

At trial, Dr. Suzuki testified that the cause of Antone's death was drowning, but Dr. Suzuki also testified that she was unable to determine how Antone drowned (i.e., the manner of Antone's death). Dr. Suzuki also described various injuries she observed on Antone's body.

The probative value of evidence that Dr. Suzuki classified Antone's manner of death as "undetermined" was minimal at best; it simply indicated that Dr. Suzuki was unable to conclusively determine whether Antone's death was a homicide. Moreover, Dr. Suzuki's inability to conclusively determine Antone's manner of death was established by her testimony that she was unable to determine how Antone drowned. In light of Dr. Suzuki's testimony that she was unable to determine how Antone drowned, any probative value of evidence that Dr. Suzuki classified Antone's manner of death as "undetermined" would have been cumulative of evidence already admitted.

In addition, allowing the introduction of evidence that Dr. Suzuki classified Antone's death as "undetermined" would have resulted in the waste of time and possible confusion of the issues. See HRE Rule 403 (2014). It would have necessitated the State's introduction of evidence explaining the medical examiner's classification scheme to place Dr. Suzuki's "undetermined" classification in context. It also may have distracted the jury from fulfilling its ultimate responsibility of determining whether Antone had been murdered. Under these circumstances, we conclude that the Circuit Court did not err in excluding evidence that Dr. Suzuki classified Antone's death as "undetermined."

V.

Susa argues that his conviction should be vacated because the prosecutor engaged in misconduct by: (1) personally vouching for the truthfulness of Collen's testimony; (2) misleading the jurors as to their decision-making function; (3) failing to control witnesses; and (4) creating State v. Pemberton, 71 Haw. 466, 796 P.2d 80 (1990), problems. Susa's arguments are without merit.

A.

The prosecutor did not personally vouch for the truthfulness of Collen's testimony. During closing argument, the prosecutor told the jury:

> The evidence shows Bryanna Antone was drowned. The evidence shows [Susa] drowned her. The case does not rise or fall on John Collen. Did the state give him a deal? Yes, we did. Did we do everything we could to try and get the truth to you? Yes, we did.

Contrary to Susa's claim, the prosecutor's remarks do not reflect that he was expressing a personal opinion regarding Collen's credibility. Instead, the prosecutor was (1) referring to evidence that the State had entered into a cooperation/plea agreement with Collen and (2) explaining that the State had entered into this agreement with Collen in order to secure his testimony for the jury's consideration.

11

B.

The prosecutor did not mislead the jurors regarding their decision-making function. The prosecutor stated:

> John Collen said he had information pertinent to this case, he gave us that information, it was then presented to you. In order to do that, he wanted a deal. The deal was done. Guess who gets to decide whether or not what he said was accurate, inaccurate, truthful or untruthful? You do. But at least you have it. You wouldn't have it without a deal. Does the case rise or fall on his testimony? Absolutely not.
>
> There's all the other evidence that we talked about. You guys get to go back there and make that call. What you don't get to do is go back there and say John says one thing, [Susa] says another, I just don't know, so I guess I'm just going to find him not guilty. No. You guys are the judges of the facts. You all said in the beginning that this was something you could do. You could look at the evidence that's presented, you can decide what happened, and that's all we're asking you to do.

Susa did not object to the prosecutor's remarks. Contrary to Susa, we do not construe the prosecutor's remarks as telling the jurors that they were precluded from returning a not guilty verdict if they could not decide between Collen's and Susa's version of events. Rather, we construe the prosecutor's remarks as urging the jurors to fulfill their responsibility as the triers of fact to determine the truth, to consider all the evidence, and to not acquit Susa simply because conflicting testimony was presented. In other words, that conflicting testimony does not necessarily warrant a not guilty verdict. So construed, we conclude that the prosecutor's remarks did not constitute plain error.

C.

Susa argues the prosecutor engaged in misconduct by failing to control witnesses, which resulted in witnesses making references to his federal detention paper and his outstanding warrants. These references were made during the prosecutor's examination of Officer Ke Aka Aiu (Officer Aiu) and Detective Ken Higa (Detective Higa).

Officer Aiu recovered Antone's slippers and a paper with Susa's name on it in the vicinity of where Antone's body was

12

found. Officer Aiu referred to the paper with Susa's name on it as a "federal detention paper." Detective Higa interviewed Susa at the hospital on October 5, 2009, after Susa's suicide attempt. The prosecutor asked Detective Higa whether he would have allowed Susa to walk out of the hospital at that time, since by then, Susa's DNA had been matched with the vaginal swab taken from Antone. In response, Detective Higa stated that Susa would probably have been arrested based on Susa's "warrants."

Susa does not contend that the prosecutor's questioning was designed or intended to elicit the challenged references. In addition, Susa did not object to these references when they were made at trial. We conclude that the prosecutor's actions did not constitute misconduct and that the brief references to "federal detention paper" and "warrants" did not affect Susa's substantial rights. The Circuit Court had already ruled that evidence that Susa had been recently released from prison was admissible in connection with his attempt to commit suicide. In addition, Susa himself testified that he tried to commit suicide because "[i]t would have been the third time that I would have went back to jail[.]" Accordingly, the prejudicial effect of the challenged references was minimal as the references were cumulative of other properly admitted evidence. See State v. Crisostomo, 94 Hawai'i 282, 290, 12 P.3d 873, 881 (2000); Clark, 83 Hawai'i at 298, 926 P.2d at 203. We conclude that there was no plain error.

D.

We reject Susa's Pemberton claim. In Pemberton, "[t]he trial court was continuously forced to sustain objections by defense counsel due to the prosecutor's repeated attempts to bring inadmissible evidence to the jury's attention[.]" Pemberton 71 Haw. at 473-74, 796 P.2d at 84. The Hawai'i Supreme Court concluded that "the number of instances and the tenor of the exchange between judge and [the prosecutor] evince a premeditated pattern of improper questioning and an effort to alert the jury to the existence of inadmissible evidence." Id. at 476, 796 P.2d at 85. The court held that "the cumulative

13

effect of the prosecutor's improper conduct was so prejudicial as to deny [the defendant] a fair trial."  Id.

Susa does not provide specific examples to support his alleged Pemberton claim, but simply attaches 14 pages of the trial transcripts without additional elaboration.  We conclude that Susa has failed to demonstrate that the prosecutor engaged in Pemberton misconduct.

## VI.

Susa's contention that the Circuit Court erred in responding to a communication from the jury and in failing to declare a mistrial is without merit.

During its deliberations, the jury sent a communication to the Circuit Court stating, "CANNOT GET A UNIMOUS [sic] VERDICT NEED YOUR HELP."  Over Susa's objection and request for a mistrial, the Circuit Court responded to the jury as follows: "Do you have a question as to how the Court may be of help?  Please refer to the Court's instructions."  There was no additional communication from the jury before it informed the Circuit Court that it had reached a verdict.

Susa argues that the Circuit Court's response "amount[s] to a directive that a verdict MUST be reached[.]"  He further contends that the Circuit Court's response was analogous to an Allen charge,[3] directing minority jurors to reconsider their view in light of the view of the majority, which the Hawai'i Supreme Court held was improper in State v. Fajardo, 67 Haw. 593, 699 P.2d 20 (1985).  We are not persuaded.  The Circuit Court's response clearly was not a directive that a verdict must be reached, but an invitation to the jury to clarify how the Circuit Court could help the jury.  The Circuit Court's response also did not admonish minority jurors or constitute an Allen charge.  We find no error in the Circuit Court's response to the jury.

---

[3] United States v. Allen, 164 U.S. 492 (1896).

VII.

Susa claims that his trial counsel provided ineffective assistance by failing to point out in closing argument that Collen's claim that he had taken a t-shirt from the beach on October 2, 2009, was contradicted by other evidence presented in the case. Jacek Jucewicz (Jucewicz) testified that in the early morning of October 2, 2009, he had been walking the beach, and he discovered and took a t-shirt and a "lady's bag" that appeared to have been left behind. These items were eventually turned over to the police, and the lady's bag was identified as a purse belonging to Antone.

In closing argument, defense counsel did discuss Jucewicz's testimony that he had taken a t-shirt and a bag from the beach. Moreover, defense counsel spent a significant portion of her closing argument attacking Collen's credibility. We conclude that Susa has failed to satisfy his burden of showing that his trial counsel provided ineffective assistance. See State v. Richie, 88 Hawaiʻi 19, 39, 960 P.2d 1227, 1247 (1998).

CONCLUSION

For the foregoing reasons, we affirm the Circuit Court's Judgment.

DATED: Honolulu, Hawaiʻi, January 30, 2015.

On the briefs:

Lila Barbara Kanae
for Defendant-Appellant

Sonja P. McCullen
Deputy Prosecuting Attorney
City and County of Honolulu
for Plaintiff-Appellee

Craig H. Nakamura
Chief Judge

Associate Judge

Associate Judge

15